**GREGORY M., BY AND THROUGH his parents and next friends, ERNEST M. and Suzanne M., Plaintiffs,**

**v.**

**The STATE BOARD OF EDUCATION OF the STATE OF CONNECTICUT; Shelton Board of Education; Gerald Tirozzi, in his official capacity as Commissioner of Education, State of Connecticut; Leon Sylvester, in his official capacity as Superintendent of Schools, Shelton, Connecticut; and Mary Lou Cook, in her official capacity as Director of Special Education, Shelton, Connecticut, Defendants.**

Civ. No. 5–91–379 (WWE).

United States District Court, D. Connecticut.

March 21, 1995.

---

Michael G. Kinsella, Gallant & Gallant, Guilford, CT, for plaintiffs.

Carroll T. Willis, Jr., Atty. General's Office, Education/Dmr Dept., Hartford, CT, for defendants.

## RULING ON MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

EGINTON, Senior District Judge.

Plaintiffs, Ernest M. and Suzanne M., commenced this action on behalf of their son, Gregory, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, against defendants State Board of Education of the State of Connecticut ("State Board"), Shelton Board of Education ("School Board"), Gerald Tirozzi, Leon Sylvester, and Mary Lou Cook.

Plaintiffs appeal the administrative decision of a state education department hearing officer denying reimbursement of Gregory's private special education tuition costs and expenses incurred during the 1988–89 and 1989–90 school years. Defendants Shelton Board of Education, Leon Sylvester and Mary Lou Cook, have moved for a judgment upon the administrative record. For the following reasons, the motion will be granted.

## I. BACKGROUND

From 1982 to the spring of 1988, Gregory attended first through fourth grade at Booth Hill School, a public school within the Shelton School District. During his first grade, Gregory was described as having a "short attention span" and being "physically and emotionally immature for his age." He completed the school year with three C's and two D's. Upon the recommendation of his teacher and with parental consent, Gregory repeated first grade.

Although Gregory got off to a good start during this repeat of first grade, he eventually began to display the same symptoms of immaturity and lack of concentration he had previously displayed. At the end of the year,

Gregory attained a C average and was promoted to the second grade.

Gregory's second grade experience was similar to the previous school year. His teacher observed that Gregory was easily distractible and unmotivated. Since he obtained a grade C average, Gregory was promoted to the third grade but his teacher recommended an evaluation to determine what strategies could be implemented to address his difficulties.

As a result of this recommendation, on June 26, 1986, a planning and placement team ("PPT")[1] meeting was held to determine if Gregory should be evaluated for special education. Joanna Harton, the Booth Hill school psychologist at the time, chaired the PPT meeting. Gregory's parents were in attendance. At the meeting, the PPT authorized psychoeducational and occupational therapy evaluations and an optometrist exam.

At the meeting, the parents were requested to sign a Request for Consent to Test Form which listed the parents' due process rights on the reverse side. The parents signed the front of the Form and immediately returned it to Joanna Harton. Under the parents signature line, the Form contains a checkmark and the initials of Joanna Harton before the statement: "Attachments: School Systems Record Policy; Statement on Independent Evaluation; Statement on Due Process Rights." The School Board maintains that the checkmark and initials indicate that Joanna Harton tendered to plaintiffs copies of the booklets entitled "A Parents Guide to Special Education in Connecticut" and "Parent Rights and Due Process Information." Plaintiffs deny receipt of those booklets.

In carrying out the testing authorized by the PPT, Joanna Harton administered to Gregory the Wechsler Intelligence Scale for Children—Revised (WISC–R) and the Kaufman Test of Educational Achievement (K-TEA). Results on the WISC–R indicated intellectual functioning of average to low av-

---

1. A planning and placement team is defined as "a group of certified and/or licensed professionals, who represent each of the teaching, administrative and pupil personnel staffs and who participate equally in the decisionmaking process to determine the specific educational needs of the child and develop an individualized educational program [IEP] for the child." Conn. Agencies Regs. 10–76a–1(p).

erage range. Gregory's scores on the K–TEA showed that Gregory was achieving at or slightly below his grade level.

On October 24, 1986, a Central PPT, chaired by defendant Cook, which the parents attended, convened to review the testing and to determine if Gregory was eligible for special education. The Central PPT determined that Gregory was ineligible for special education as a learning disabled child because his achievement level was commensurate with his intellectual ability. The Central PPT recommended that Gregory remain mainstreamed in a regular class but be given preferential seating at the front of the classroom. The parents agreed with this finding.

Gregory completed third grade receiving the following marks: reading—C, math—C+, english—C, handwriting—D, spelling—C, social studies—C and science—D. Gregory began fourth grade in September, 1987. His behavior at the start was described as "oppositional, disruptive and distractible," however, Gregory made progress by the end of the year. His teacher wrote on his final report card: "Lately Greg has been putting forth effort to improve. With continued effort he should do fine." On the Connecticut Test of Basic Skills, a standardized group achievement test, Gregory achieved average scores compared to the national norm. At the end of the year, Gregory's final grades were: reading—C, math—D, english—C−, handwriting—D, spelling—C, social studies—D, and science—D. He was promoted to the fifth grade.

In August, 1988, Gregory was sent home from summer camp due to disruptive behavior. The parents, frustrated with Gregory's behavior, decided to look into sending Gregory to other schools. In conjunction with their investigation, plaintiff Ernest M. consulted with Robert Greenwood, an educational counselor. Mr. Greenwood informed Ernest that Gregory was in need of a reevaluation and recommended that such a reevaluation be requested from the School Board. Mr. Greenwood explained to Ernest the need for a "team decision" between the School Board and the parents in order for the School Board to fund a private special education placement.

The parents did not seek a reevaluation from the School Board, but unilaterally enrolled Gregory in Eagle Hill, a private school in Southport, state approved for special education for children with learning disabilities. Plaintiff Ernest M. thereafter informed Frank Skoronski, the Booth Hill school principal, and defendant Cook by telephone that Gregory would not be returning to Booth Hill in September. Plaintiff Ernest M. also asked Cook whether the School Board was obligated to pay for the costs and expenses associated with sending Gregory to Eagle Hill. Cook informed him that the School Board was not obligated to pay for such services unless Gregory required special education that the School Board could not provide him.

Gregory was enrolled in Eagle Hill for the school years 1988–89 and 1989–90. Gregory completed his homework while at Eagle Hill and successfully participated in an eight week summer camp. However, Gregory still had significant difficulties in competitive situations and with peer interactions. The program at Eagle Hill employed many types of competitive games in its instruction. Also, the program did not have any type of behavioral management system for Gregory. Two of Gregory's teachers at Eagle Hill during his second year reported that Gregory displayed "negative, inappropriate behavior frequently enough to cause significant concerns."

In the early part of 1990, plaintiff Ernest M. contacted Tony Pagliaro, Shelton's Superintendent of Schools at the time, to inquire whether the School Board was obligated to pay for Gregory's education at Eagle Hill. Mr. Pagliaro informed Ernest that a reevaluation and a PPT were first necessary.

After a reevaluation by Margo Zboray, the Booth Hill psychologist at that time, the Central PPT determined that Gregory was eligible for special education services due to a social and emotional maladjustment, not a learning disability. The Central PPT recommended that Gregory be put into special education classes pending mainstreaming into regular classes. Prior to the Central PPT, a neurologist diagnosed Gregory as a

child suffering from Attention Deficit Disorder with Hyperactivity ("ADDH").

The parents subsequently filed a request for a due process hearing before a state education department hearing officer seeking reimbursement for the two years Gregory attended Eagle Hill. The parents claimed that the School Board failed to identify Gregory's special education needs earlier and failed to inform them of their due process rights in 1986 and 1988.

The hearing officer conducted a five day administrative hearing and issued a decision in favor of defendants. The hearing officer concluded: 1) Gregory was not a child requiring special education at the time of the PPT and Central PPT meetings in 1986 but was manifesting symptoms of social and emotional maladjustment in 1988 when the parents placed him at Eagle Hill; 2) The mainstream fifth grade classroom in 1988 would not have been an appropriate placement for Gregory without special education assistance; 3) It was harmless error that the parents were not notified of their due process rights during the PPT and Central PPT meetings in 1986; 4) The parents had actual knowledge of their due process rights in 1988 prior to placing Gregory at Eagle Hill; 5) The private placement at Eagle Hill was not appropriate; and 6) The parents claim for reimbursement is without merit. This appeal followed.

## II. DISCUSSION

The IDEA provides federal assistance to states which in turn are required to provide handicapped children with a free appropriate public education[2]. The IDEA imposes procedural safeguards "designed to afford parents or guardians of handicapped children meaningful involvement in the educational placement of their children." *Christopher P. by Norma P. v. Marcus*, 915 F.2d 794, 800 (2d Cir.1990). These safeguards require that the state or local educational agency provide the parents with prior written notice whenev-

er the educational agency proposes or refuses to "initiate or change ... the identification, evaluation, or educational placement of the child...." 20 U.S.C. § 1415(b)(1)(C). Such educational agency is also required to give the parents an opportunity to present a complaint about "any matter relating to the identification, evaluation, or educational placement of the child...." 20 U.S.C. § 1415(b)(1)(E). The parents then have the right to challenge this matter through an impartial due process hearing conducted by the state or local educational agency. 20 U.S.C. § 1415(b)(2).

After a final administrative decision from a hearing officer, the aggrieved party may seek judicial review in state or federal court. The court reviews the administrative record, hears additional evidence upon the request of either party, and grants any relief it deems appropriate. 20 U.S.C. § 1415(e)(2).

The court is required to give deference to the hearing officer's decision, being "careful to avoid imposing [its] view of preferable education methods." *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). The court can grant retroactive reimbursement to parents for a unilateral private placement if the court finds private placement, as opposed to public school placement, appropriate. *Burlington School Committee v. Department of Educ.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

In this case, none of the parties have requested the court to hear additional evidence. Plaintiffs argue that Gregory was denied a free appropriate public education due to the School Board's procedural and substantive violations of the IDEA. Plaintiffs argue that the School Board failed to notify plaintiffs of their due process rights in 1986 or 1988 in accordance with the procedural requirements of the IDEA. Plaintiffs further argue that Mr. Greenwood's advice in August, 1988, cannot be considered adequate notice to plaintiffs of their due process rights. Plaintiffs

---

**2.** 20 U.S.C. § 1401(a)(18) defines "free appropriate public education" as "special education and related services that—(A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary or secondary school education in the State involved, and (D) are provided in conformity with [an] individualized educational program [IEP]...."

contend that the School Board violated the substantive requirements of the IDEA by not finding Gregory eligible for special education in the fall, 1986, at the time of the Central PPT or during the remainder of his third and fourth grades. Plaintiffs also claim that Eagle Hill was an appropriate placement for Gregory.

## A) Compliance with the IDEA's Procedural Requirements

■ Plaintiffs first argue that the School Board failed to inform them of their due process rights either in 1986, when Gregory was evaluated, or in 1988, when plaintiff Ernest M. contacted Mr. Skoronski and defendant Cook to inform them that Gregory would not be returning to Booth Hill in the fall. Plaintiffs contend that such failures in and of themselves denied Gregory an appropriate free public education and automatically entitles them to reimbursement for Gregory's private placement expenses.

Plaintiffs cite *Hall v. Vance County Bd. of Educ.*, 774 F.2d 629 (4th Cir.1985) in support. In *Hall*, the court found that a child with dyslexia was denied a free appropriate public education due to uncontroverted evidence that the school system failed for three years to notify the parents of their due process rights.

Upon review of the documentary evidence and the testimony of Joanna Harton, the court finds plaintiffs' argument unpersuasive, and reliance upon *Hall* misplaced. As noted above, the Request for Consent to Test Form, signed by the parents at the June 1986, PPT, contains a checkmark and the initials of Joanna Harton next to the phrase: "Attachments: School Systems Record Policy; Statement on Independent Evaluation; Statement on Due Process Rights."

Joanna Harton testified that her usual practice was to hand parents the booklets entitled "A Guide to Special Education in Connecticut" and "Parent Rights and Due Process Information" when the parents sign the consent for the evaluation. The initialed checkmark constituted a record, in her opinion, that Gregory's parents received the booklets. She testified that "there's absolutely no other reason that that check and

my initials would be there other than my giving the rights to the parents." There is no dispute that the PPT meeting was held in Ms. Harton's office. Ms. Harton also testified that the parents signed the Request for Consent to Test Form in her office, which is where the booklets were kept.

The hearing officer's conclusion that it is unlikely that the parents received notice of their due process rights seems to be hinged on defendant Cook's testimony that the booklet entitled "A Guide to Special Education in Connecticut" was given only to parents whose children were found to be eligible for special education. Since Gregory was found not to qualify for special education, the hearing officer concluded that the parents probably did not receive a copy of this booklet. However, Cook was present only at the Central PPT meeting in October, 1986, not for the June, 1986, PPT meeting chaired by Ms. Harton. Ms. Harton testified that she knew of her duty to notify plaintiffs at the PPT meeting of their due process rights, which required distribution of these booklets. In addition, Cook testified that plaintiffs were entitled to receive notice of their due process rights on or about the time of the June, 1986, PPT and the October, 1986, Central PPT meetings.

Even if plaintiffs did not receive these booklets, plaintiffs, unlike the parents in *Hall*, fully participated in the PPT and Central PPT meetings, according them "meaningful involvement with the educational placement of their child", and thereby fulfilling the goal of the IDEA's procedural requirements. *Doe v. Defendant I*, 898 F.2d 1186, 1191 (6th Cir.1990) (EAHCA's [now IDEA] procedural requirements met in light of parents' full participation in the development of the child's education plan). Further, there is no evidence that the parents disagreed with or complained to the School Board about Gregory's program at any time during the remainder of Gregory's third or fourth grades. *Evans v. District No. 17 of Douglas County, Nebraska*, 841 F.2d 824, 831–32 (1988) ("A school district should be on notice of disagreements and given an opportunity to make a voluntary decision to change

or alter the educational placement of a handicapped child.").

In addition, Mr. Greenwood's recommendation to plaintiff Ernest M. to return to the school and request an updated evaluation of Gregory prior to placing him in a private school gave plaintiffs additional notice of the available avenue within the school system, contrary to Ernest's testimony that he believed the 1986 Central PPT had shut the door on any options within the school system. Mr. Greenwood also testified that he informed the parents of the process for obtaining a private placement. Instead of returning to the school, plaintiffs enrolled Gregory in Eagle Hill without taking advantage of this available procedural mechanism. It is evident that plaintiffs wanted to place Gregory in Eagle Hill regardless of whether or not Booth Hill could provide Gregory with a free appropriate public education.

Also, plaintiff Ernest M.'s conversation with Mr. Skoronski and defendant Cook cannot be considered a request for the School Board to initiate a reevaluation. While Mr. Skoronski and Cook should have taken a more aggressive approach by reminding the parents of their right to invoke review proceedings, the parents failed to inform either Skoronski or Cook of Gregory's summer camp experience which, according to Ernest's testimony, was the "straw that broke the camel's back" and precipitated plaintiffs' decision to place Gregory in Eagle Hill.

Accordingly, the court finds that the documented evidence and the testimony of Joanna Harton indicates that the parents received notice of their due process rights. The parents also fully participated in both the PPT and Central PPT meetings, fulfilling the goal of the IDEA'S procedural requirements. Finally, the court finds that the parents also received additional notice of their right to a reevaluation and notice of the process for private placement in August, 1988, through Robert Greenwood, prior to placing Gregory at Eagle Hill.

**B) Public School Placement**

Plaintiffs next argue that the School Board failed to diagnose Gregory as eligible for special education in October, 1986. In support of this argument, plaintiffs offer the testimony of Stuart Losen for support of the proposition that Gregory exhibited "classic signs" of a child with a developing learning disability. The hearing officer found this testimony unpersuasive, finding that Gregory was not a child eligible for special education in 1986 as learning disabled.

Conn.Gen.Stat. § 10–76a defines a child with an "identifiable learning disability" as:

one who exhibits a severe discrepancy between educational performance and measured intellectual ability and who exhibits a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, which may manifest itself in a diminished ability to listen, speak, read, write, spell or to do mathematical calculations.

The results of the K–TEA and Gregory's grades of C do not demonstrate a severe discrepancy between Gregory's ability and his achievement. In light of this evidence, according the required deference to the hearing officer's findings, the court agrees with the hearing officer's conclusion that Gregory was ineligible for special education as a learning disabled child in 1986.

In addition, plaintiffs have not referred the court to any evidence to overcome the hearing officer's conclusion that Gregory's behavioral difficulties in 1986 were more speculative signs than clearly diagnostic of a social and emotional maladjustment.

Connecticut Agencies Regulation § 10–76a–2(m) defines the term "socially and emotionally maladjusted" as:

"a condition exhibiting one or more of the following characteristics" over a long period of time and to a marked degree, which adversely affects educational performance:

(1) An inability to learn which cannot be explained by intellectual, sensory or health factors;

(2) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

(3) Inappropriate types of behavior or feelings under normal circumstances;

(4) A general pervasive mood of unhappiness or depression; or

(5) A tendency to develop physical symptoms or fears associated with personal or school problems.

Given Gregory's C level grades and his functioning in the mainstream classroom without significant disruption, there was sufficient evidence from which the hearing officer reasonably concluded that Gregory's education was not significantly impeded or adversely affected by his behavioral difficulties.

Plaintiffs also argue that the hearing officer erred in failing to find that Gregory was eligible for special education during the remainder of his third and fourth grades due to the deterioration of his grades. Gregory's final third grade marks were at a grade C level. Although his fourth grade marks deteriorated slightly from his third grade marks, he still achieved within the national average range on the Connecticut Test of Basic Skills. Also, his teacher remarked that he was making significant progress. Plaintiffs have not made a sufficient showing of error to prompt reversal of the hearing officer's finding on this matter.

## C) Appropriateness of Placement at Eagle Hill

■ Plaintiffs next claim that the hearing officer erred in his finding that plaintiffs' placement of Gregory at Eagle Hill was inappropriate. The hearing officer found that "[w]ithout State Department of Education approval as a program qualified to meet the special education needs of social and emotional maladjusted students, the Eagle Hill School cannot be said to be a program appropriate to meet G's educational needs."

The court finds that in light of the Supreme Court's decision in *Florence County School Dist. No. Four v. Carter*, —— U.S. ——, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993), the hearing officer's conclusion regarding the licensing issue is incorrect as a matter of law. In *Florence*, the Supreme Court held that the appropriateness of a private placement does not depend on whether the institution satisfies the state educational requirements for the particular handicap but whether the education given to the child "is reasonably calculated to enable the child to receive educational benefits." *Florence County School Dist. No. Four*, —— U.S. at ——, 114 S.Ct. at 364 (*quoting Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051). Accordingly, the substance of the private placement program is determinative of whether the program is appropriate, not whether the private school is licensed by the state to care for those children with a particular handicap.

Plaintiffs contend that Gregory achieved some educational benefit while at Eagle Hill because Gregory completed daily homework assignments, an eight week summer camp program, and did not regress academically. However, the record contains evidence supporting the conclusion that the program at Eagle Hill adversely affected Gregory socially and emotionally.

According to the testimony of Margo Zboray, who observed Gregory in class at Eagle Hill and spoke with several of his teachers, there was no behavioral management plan to deal with Gregory's increasingly inappropriate behavior which caused "significant concerns" to several of Gregory's teachers. The usual method the teachers used was to either remove Gregory from the classroom or ignore certain behaviors to avoid the likelihood of Gregory having a temper tantrum, such tantrums occurring on an almost regular basis. She also testified as to Gregory's inappropriate "aggressiveness" towards his peers.

Additionally, Gregory had great difficulty in competitive situations. Ms. Zboray testified that the method of instruction "involved many competitive types of activities" such as math and spelling games which exacerbated Gregory's difficulties and seemed to overstimulate him. She also testified that the Eagle Hill program adversely affected Gregory's ability to engage in a large classroom environment. In light of the evidence that Gregory regressed socially and emotionally, the court finds that the program at Eagle Hill was not an appropriate placement for Gregory.

Since plaintiffs have not demonstrated that private placement, as opposed to public school placement, was appropriate, they do

not satisfy the test set forth in *Burlington School Committee* and are not entitled to reimbursement.

## II. CONCLUSION

Based on the foregoing, defendants Shelton Board of Education, Sylvester and Cook's motion for judgment upon the administrative record [# 46] is GRANTED. The Clerk is directed to enter judgment in favor of these three defendants.