**John DOE, Jr., By and Through his parents and next friends, John and Jane DOE**

v.

**The BOARD OF EDUCATION OF The STATE OF CONNECTICUT, et al.**

**Civ. No. B–88–441(EBB).**

United States District Court,
D. Connecticut.

Oct. 24, 1990.

Betty G. Levy, Keith Bradoc, Toni Hahn Davis, Gallant & Gallant, New Haven, Conn., for plaintiff.

---

Ellen S. Boer, Greenwich, Conn., Maureen Murphy, John R. Whalen, McKenzie Hall, Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

### ELLEN B. BURNS, Chief Judge.

This action is an appeal from a decision of the Connecticut State Board of Education. For four days during March and April, 1988, a hearing was held before a Connecticut state-appointed hearing officer to determine whether the plaintiff, John Doe, was a handicapped child entitled to special education pursuant to the Education of All Handicapped Children Act ("EAHCA" or "Act"), 20 U.S.C. § 1401 *et seq.* and Conn.Gen.Stat. § 10–76a(i). On May 5, 1988, the hearing officer rendered a decision that the plaintiff was not an "exceptional child" within the meaning of Conn. Gen.Stat. § 10–76a(c) and Conn. Agencies Regs. § 10–76a–1(i) and was not entitled to special education or related services under Conn.Gen.Stat. § 10–76a, *et seq.*

The plaintiff, through his parents and next friends, appeals from this decision and requests, *inter alia,* that the court order the defendant Darien Board of Education to assume the costs of the plaintiff's special education, including psychotherapy and related services incurred by his placement at the Grove School. The plaintiff alleges that the hearing officer's decision violated the plaintiff's right to a "free and appropriate" education within the meaning of the EAHCA; that the decision misapplied Connecticut law, particularly Conn.Gen.Stat. § 10–76a; and that the hearing officer's conduct at the hearing was "prejudicial, unreasonable, improper, violated applicable rules of practice and deprived the plaintiff of due process."

### Background

The plaintiff attended regular classes and participated in the gifted program in Darien public schools from kindergarten through fifth grade. He did well academically in school during this time, although there is evidence in the record from which to conclude that he was sometimes difficult.[1] These behavior problems do not appear to have been severe. However, in January, 1987 in his sixth grade, John had emotionally deteriorated to the extent that his parents found it necessary to hospitalize him at the New York Hospital–Cornell Medical Center ("NYH–CMC") on January 9, 1987. At the hearing, John's parents described his condition at this time as depressed and violent.[2] The plaintiff remained at NYH–CMC until the beginning of May, 1987. While John was at NYH–CMC, the Darien School Board contracted with the White Plains School District to provide him with education.[3] Board Exhibit 20. White Plains operated an education program on the hospital grounds.

As the time came for John to be released from the hospital, his educational placement became a concern to his parents and the Darien School Board. A Central Planning and Placement Team ("CPPT") meeting was held on May 6, 1987 to discuss the

---

1. For example, his first grade teacher commented that "[a]lthough [he] had done well academically in first grade, he needs to learn to be considerate and aware of other children. He always wants to be first and will push and shove others to get there. [He] also should learn to respect authority and accept constructive criticism." His second grade teacher noted that he was easily distracted and impulsive and needed to improve his self-discipline. His third grade teacher similarly noted that his "impulsive nature is causing him some problems." In the fourth grade, his teacher discussed his "attitude and attention-getting tactics which at times are distracting to the class." His fifth grade teacher for the gifted program noted that he was not always "on-task." His regular fifth grade teacher commented that he had "had 'a rough go of it' this grading period. His work performance and

personal and social development have been very erratic." Finally, his sixth grade science teacher commented that his "behavior gets in the way of his education." The plaintiff's teachers often indicated that he had organizational problems. Parent Exhibit 2.

2. For example, John's father testified that John broke eighteen windows at his house during one of his violent outbursts. 3/18/88 Hearing Transcript at 190. His mother testified that he would refuse to get up and go to school. 4/5/88 Hearing Transcript at 105.

3. Connecticut Agencies Regulations provide that school boards educate homebound and hospitalized children. Conn. Agencies Regs. § 10–76d–15.

plaintiff's educational placement.[4] The minutes of the meeting reflect that a social worker from NYH–CMC, Mr. Laffer, stated that the hospital recommended a residential treatment facility for John. His parents had already selected the Grove School in Madison, Connecticut and requested that this placement be fully funded by the school board as an educational, and not a medical, placement.[5] The school board offered to pay for educational costs if the placement was for medical reasons. The board also informed John's parents that a determination had to be reached as to his need for special education and for an educational placement in a residential facility before the board could assume the cost of the placement. The meeting ended, and John's parents were to inform the CPPT whether to formally consider the Grove School as an educational placement. Board Exhibit 26.

The plaintiff was unilaterally placed by his parents at the Grove School on his discharge from the hospital in May, 1987. The CPPT meeting was reconvened on August 19, 1987, with John's parents and attorneys for the parents and for the school board in attendance. School officials distributed a draft of an Individualized Education Program ("IEP") for John, though no determination had been made as to whether he qualified for special education.[6] The school officials informed John's parents that they felt the Darien public school could meet his educational needs. John's parents made no decision as to the acceptability of the IEP, and they asked to have the meeting continued until they had consulted NYH–CMC. Board Exhibit 37. John's parents notified Darien officials in

January, 1988 that the proposed IEP was unacceptable and renewed their request to have Darien pay for the full costs incurred by John at the Grove School. Board Exhibit 41. Darien again responded that they would pay for the educational costs of the plaintiff's placement if it was for other than educational reasons. Board Exhibit 44. No resolution was reached as to whether the plaintiff's placement at the Grove School was for educational or other reasons. John's parents thereafter initiated state due process procedures. A mediation was held in February, 1988 which did not resolve the dispute. The hearing in question was then held in March and April of 1988.

*Discussion*

The purpose of the EAHCA is

to assure that all handicapped children have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, [and] to assure that the rights of handicapped children and their parents or guardians are protected.

20 U.S.C. § 1400(c). To accomplish its objective, the EAHCA provides federal money to state and local educational agencies that agree to implement its requirements. *See, e.g.,* 20 U.S.C. § 1412.

The Act defines a "free appropriate education" to mean

special education and related services that—(A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool,

---

**4.** A planning and placement team is defined as "a group of certified and/or licensed professionals, who represent each of the teaching, administrative and pupil personnel staffs and who participate equally in the decisionmaking process to determine the specific educational needs of the child and develop an individualized educational program for the child." Conn. Agencies Regs. § 10–76a–1(p).

**5.** One of the parent's concerns about having the plaintiff in a day program was the possibility he would refuse to go to school. The plaintiff had a number of unexcused absences from school in December, 1987. Board Exhibit 16. In re-

sponse to this concern, Darien officials drafted a plan specifically addressing this potential problem. Board Exhibit 56.

**6.** The IEP is "a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services designed to meet those needs." *Burlington School Committee v. Massachusetts Department of Education,* 471 U.S. 359, 368, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985). The IEP is developed jointly with school officials, teachers, and the child's parents or guardians.

elementary, or secondary school education in the State involved, and (D) are provided in conformity with [an] individualized education program.

20 U.S.C. § 1401(a)(18).

"Related services" are "transportation, and such developmental, corrective, and other supportive services (including ... psychological services [and] ... medical and counseling services ...) as may be required to assist a handicapped child to benefit from special education, and includes the early identification and assessment of handicapping conditions in children." 20 U.S.C. § 1401(a)(17).

The Act includes "procedural safeguards" "to insure the full participation of the parents and proper resolution of substantive disagreements." *Burlington,* 471 U.S. at 368, 105 S.Ct. at 2002. Section 1415(b)(2) affords parents or guardians "an opportunity for an impartial due process hearing" to be provided by the state or local educational agency. The Act also provides for judicial review in state or federal court to "[a]ny party aggrieved by the findings and decision" made in the due process hearing. 20 U.S.C. § 1415(e)(2). The reviewing court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is proper." 20 U.S.C. § 1415(e)(2).

In *Hendrick Hudson Board of Education v. Rowley,* 458 U.S. 176, 207, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982), the Supreme Court stated that this review provision "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." The Court noted that reviewing courts must give due weight to state administrative proceedings. The Second Circuit in *Karl v. Board of Education of Geneseo Central School District,* 736 F.2d 873, 877 (1984), concluded that *"Rowley* requires that federal courts defer to the final decision of the state authorities." *See also Briggs v.*

*Board of Education of the State of Connecticut,* 882 F.2d 688, 691 (2d Cir.1989).

The first issue to be addressed in this review is whether the plaintiff is a handicapped child in need of special education. Under 20 U.S.C. § 1401(a)(1), the term "handicapped children" is defined as "mentally retarded, hard of hearing, deaf, speech or language impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, or other health impaired children, or children with specific learning disabilities, who by reason thereof require special education and related services." Federal regulations define the term "seriously emotionally disturbed" as

a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree, which adversely affects educational performance:

(A) An inability to learn which cannot be explained by intellectual, sensory, or health factors;

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

(C) A general pervasive mood of unhappiness or depression; or

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

(ii) The term includes children who are schizophrenic. The term does not include children who are socially maladjusted, unless it is determined that they are seriously emotionally disturbed.

34 C.F.R. § 300.5(b)(8).

Connecticut law on the subject is very similar to federal law; a "socially and emotionally maladjusted child" is defined as "one who is incapable of fully profiting from the general educational programs of the public schools because of some serious social or emotional handicap ..., but who is expected to profit from special education." Conn.Gen.Stat. § 10–76a(i). Connecticut Agencies Regulations further define this term as

a child with a psychological condition, stemming from inter- or intra-personal conflict, which manifests itself in behav-

ior which significantly impedes the child's rate of educational development. The term emotionally maladjusted shall refer to a child whose condition includes one or more of the following characteristics:

(a) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

(b) Inappropriate types of behavior or feelings under normal circumstances;

(c) A general pervasive mood of unhappiness or depression; or

(d) A tendency to develop physical symptoms or fears associated with personal or school problems.

Conn. Agencies Regs. § 10–76a–2(m). Connecticut General Statute § 10–76a(c) defines an "exceptional child" as a "child who deviates either intellectually, physically, socially or emotionally so markedly from normally expected growth and development patterns that he or she is or will be unable to progress effectively in a regular school program and needs a special class, special instruction, or special services."

██ The plaintiff claims that he was a "socially and emotionally maladjusted child," and an "exceptional child," in need of special education at a residential facility. The court will first consider the evidence that arguably supports the plaintiff's position. There are several evaluations of the plaintiff's mental condition in the record, some from the time of his hospitalization and one from August, 1987, after his hospitalization. Board Exhibits 21, 23, 28, and 32. A report by Mr. Laffer, a social worker, at approximately the time of the plaintiff's admission to the hospital, describes the plaintiff as a "male with angry sullen mood who refuses to cooperate with examiner. Externalizes blame for difficulties. Insight and judgement believed significantly impaired at this time." Board Exhibit

21. Dr. Picker, a clinical psychologist at NYH–CMC, who evaluated John in February and March of 1988, found that he "exhibits many characteristics of depression, but this is best understood as an underlying condition. In many ways, [his] episodes of rage is [sic] an optionless, 'last ditch' effort to ward off a total experience of dysphoria." Board Exhibit 23 at 6. Dr. Picker also commented on the plaintiff's significant anxiety level, particularly in relation to his performance on tests. *Id.* at 3–6. Dr. Picker concluded that John

> has significant difficulties in dealing with his emotions, and employs considerable psychological energy to remain distant from any affective interaction. Such strategies must invariably fail, and this regularly results in a flood of emotional anguish and behavioral loss of control for the patient. These behavioral explosions serve as painful reminders to [John] that he remains a helpless victim to his emotions, further motivating him to regard feelings as undesirable. *Id.* at 6.

A report dated April 3, 1987 by Mr. Laffer states that "[p]atient's mood is angry and sad. He relates in an irritable, agitated manner. He tends to be oppositional and argumentative. No evidence of psychosis is noted." Board Exhibit 28 at 3. Mr. Laffer's report recommended a structured residential facility for the plaintiff with intensive psychotherapy. *Id.*[7]

At the hearing, the plaintiff offered testimony from his treating psychiatrist at the Grove School and the director of the Grove School to demonstrate his emotional disturbance and his need for a residential placement. His psychiatrist, Dr. Tessler, testified that in his opinion the plaintiff was an exceptional child and a socially and emotionally maladjusted child within the mean-

---

7. Mr. Laffer also diagnosed the plaintiff as having a conduct disorder, major depression, and a borderline personality disorder. Board Exhibit 28 at 3. However, Mr. Laffer's diagnosis as a social worker is not very credible, and the only diagnosis Dr. Tessler, the plaintiff's psychiatrist at Grove, agreed with was the major depression diagnosis. 3/10/88 Hearing Transcript at 18–19.

In addition, as the defendant points out, Mr. Laffer's recommendation of a residential facility seems inconsistent with Dr. Picker's recommendation that John should continue to participate in a gifted class and should get *outpatient* therapy. *See* Board Exhibit 28 at 3 and Board Exhibit 23 at 6.

ing of the Connecticut statute. 3/10/88 Hearing Transcript at 21–24. He testified that John felt very pressured and could be aggressive and destructive to other children. *Id.* at 16, 28–33. He further testified that the diagnosis of major depression applied to the plaintiff. *Id.* at 18–19, 93. Dr. Tessler testified that a residential facility like the Grove School was essential for John. *Id.* at 19, 91–92. Mr. Chorney, the Director of the Grove School, similarly testified to John's need for a residential placement. 3/18/88 Hearing Transcript at 26–30. He described the plaintiff's temper outbursts at the Grove School, which progressively became less frequent. *Id.* at 18–22, 71, 75–76. As previously stated, John's parents both testified to the difficulties he had before being hospitalized. *Id.* at 180–193 and 4/5/88 Hearing Transcript 95–113. John's records from the Grove School indicate that, although he did well academically, he had some behavior problems during the 1987–88 school year. Teacher comments indicate that he was at times provocative, argumentative, distracted, uncooperative, and made self-deprecating comments. Board Exhibit 48 at 12, 13, 17–20, 22–25.

Despite the evidence of the plaintiff's behavioral difficulties, this court concludes for the following reasons that he was not a handicapped child entitled to special education.[8] The plaintiff had some emotional difficulties, but these difficulties did not adversely affect his educational performance as required by federal and state law.[9] The plaintiff's academic performance (both his grades and his achievement test results) before, during, and after his hospital-

ization were satisfactory or above.[10] In addition, two of the plaintiff's sixth grade teachers from Darien testified that they did not notice the plaintiff had any behavior problems, other than some problems with organization. 4/5/88 Hearing Transcript at 126–42, 158–65. In fact, Dr. Picker's psychological evaluation states "it does not appear that [John's] behavioral difficulties in school have contributed to academic underachievement, the very preoccupation which consumes his conscious ideation." Board Exhibit 23 at 5. On cross-examination at the hearing, Dr. Tessler agreed with this conclusion. Hearing Transcript 3/10/88 at 44. Dr. Tessler further stated on cross-examination that "[u]p to now, he has been able to do remarkably well [in school] despite his depression." *Id.* at 59. Mr. Chorney similarly testified on cross-examination that John liked school, liked succeeding, and that his emotional problems had not significantly interfered with his academics. Hearing Transcript 3/18/88 at 34–35. Dr. Seen, the Darien school psychologist, evaluated the plaintiff in August, 1987. Board Exhibit 32.[11] Dr. Seen found John's behavior initially somewhat anxious, but generally appropriate. Dr. Seen stated that he did not believe John's behavior was interfering with his learning. Board Exhibit 37. In sum, there was sufficient evidence presented to the state hearing officer from which she reasonably concluded that the plaintiff's education was not significantly impeded or adversely affected by his behavior problems and that he was therefore not entitled to special education. Hence, the hearing officer did not misapply Connecticut law, nor did the hearing offi-

---

8. Other courts have also held that children with some behavior problems are not seriously emotionally disturbed within the meaning of the EAHCA. *See, e.g., Sequoia Union High District,* E.H.L.R. Dec. 559:133 (1987); *City School District of City of New York,* E.H.L.R. Dec. 509:101 (1987).

9. In order to qualify as a seriously emotionally disturbed child, the condition must exist over a long period of time and must "adversely affect[ ] educational performance." 34 C.F.R. § 300.5(b)(8). An exceptional child under Connecticut law must be "unable to progress effectively in a regular school program." A "socially

and emotionally maladjusted child" must have a condition which "significantly impedes the child's rate of educational development." Conn. Agencies Regs. § 10–76a–1(i) & (m).

10. For his grades, *see* Board Exhibits 2–7, 11, 13, 14, 39, 40, 48. For his achievement test results, *see* Board Exhibits 10, 23, 32.

11. At the hearing, Dr. Seen stated that he saw no evidence of major depression in the plaintiff; however, it was unclear whether he was aware that the plaintiff was on medication for depression at the time of the evaluation. Hearing Transcript 4/12/88 at 209, 225–27, 356.

cer's decision deny the plaintiff his right to a "free and appropriate education."

■ The plaintiff's other arguments must fail. The plaintiff's contention that the burden of proof should have been on the school board is incorrect. Under Conn. Agencies Regs. § 10–76h–2(f)(4), the party requesting the hearing, the plaintiff in this case, bears the burden of proof. In addition, the plaintiff's references to the school board's inconsistent position about the plaintiff's status are misleading.[12] The Darien School Board never took an official position about the plaintiff's status; instead, school officials merely attempted to arrive at a solution that would be acceptable to the plaintiff's parents. The plaintiff's argument that the hearing officer erroneously relied on evidence about the plaintiff's educational performance prior to, during, and after his admission to NYH–CMC is unsupported by any legal argument. In fact, the statutes and regulations impose no limit on the evidence the hearing officer may consider except that she may only consider the evidence and exhibits entered into evidence at the hearing. Conn. Agencies Regs. § 10–76h–2(g)(1). It is hard to imagine how the hearing officer could have made a decision without considering the plaintiff's educational performance before, during, and after his hospitalization. Such evidence was highly relevant to this decision.

### CONCLUSION

This court agrees with the hearing officer's decision that the plaintiff was not an "exceptional child" in need of special education. For the foregoing reasons, the decision of the state hearing officer is affirmed.

SO ORDERED.

---

**12.** The basis for the plaintiff's references to this inconsistent position seem to originate primarily from a comment made by one school official, Mr. Saltus, at the CPPT meeting in May, 1987, that the plaintiff would qualify for special education. It can not seriously be argued that such a comment bound the Darien School Board to that position.