**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

EDWARD P. SPRINGER, a minor, by
his parents and next friends, Edward
and JoAnne Springer; EDWARD
SPRINGER; JOANNE SPRINGER,
Plaintiffs-Appellants,

v.

THE FAIRFAX COUNTY SCHOOL

BOARD,
Defendant-Appellee,

No. 97-1482

and

ROBERT SPILLANE, officially as
Superintendent, Fairfax County
Public Schools,
Defendant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-95-1789-A)

Argued: December 1, 1997

Decided: January 23, 1998

Before WILKINSON, Chief Judge, JONES, United States District
Judge for the Western District of Virginia, sitting by designation,
and MICHAEL, Senior United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Jones and Senior Judge Michael joined.

**COUNSEL**

**ARGUED:** Michael Jeffrey Eig, BOGIN & EIG, Washington, D.C., for Appellants. Thomas John Cawley, HUNTON & WILLIAMS, McLean, Virginia, for Appellee. **ON BRIEF:** Matthew B. Bogin, Helen Goff Foster, BOGIN & EIG, Washington, D.C., for Appellants. John F. Cafferky, Arthur E. Schmalz, HUNTON & WILLIAMS, McLean, Virginia, for Appellee.

_____

**OPINION**

WILKINSON, Chief Judge:

Edward Springer and his parents seek reimbursement from the Fairfax County School Board for tuition paid to a private school in which the Springers enrolled Edward after he failed the eleventh grade. The School Board determined that Edward was not suffering from a "serious emotional disturbance," as the Springers claim, and that he was therefore ineligible for special education services under the Individuals with Disabilities Education Act, 20 U.S.C. § 1415 ("IDEA"). The district court upheld the State Review Officer's determination that Edward was not disabled and that his parents were not entitled to tuition reimbursement. Because the applicable IDEA regulations do not equate mere juvenile delinquency with a "serious emotional disturbance," we affirm.

I.

During most of his years in the Fairfax County school system, Edward Springer demonstrated no need for special educational services. He progressed successfully from grade to grade in regular education programs. Throughout elementary school his grades were consistently average or above average. He attended a private school from seventh to ninth grade and received no special education services there. When he returned to Fairfax County schools for his tenth grade year, he enrolled in regular education classes at McLean High School and attained a C+ grade point average. Throughout this period, Edward maintained positive relationships with his teachers and peers.

2

During high school he participated in a church group, the Boy Scouts, and the McLean High School wrestling team.

Edward developed significant behavioral problems in his eleventh grade year. He was arrested in August 1993 for possessing burglary tools and tampering with an automobile, offenses for which he was sentenced to one year probation, fifty hours of community service, and a suspended fine of $2,500. Edward would frequently sneak out of his parents' house and stay out all night with friends. He stole from his parents and others. He regularly used marijuana and alcohol. Edward often broke school rules and had a high rate of absenteeism. He was disciplined for driving recklessly on school property, cutting classes, forgery, leaving school grounds without permission, and fighting. Towards the end of the eleventh grade, Edward and his friends stole a fellow student's car. Edward kept the car for a week of joy-riding. In connection with this episode he was sentenced to probation until his eighteenth birthday.

Although he continued to score in the average to superior range of intellectual ability on standardized tests, Edward's eleventh-grade performance suffered because he cut class and frequently failed to complete assignments. During his week of joy-riding, he skipped school and missed his final exams, causing him to fail three of his seven courses for the year. His teachers, his mother, and Edward himself agreed that these difficulties resulted from truancy, lack of motivation, and poor study habits. At the time, Edward recognized that with more effort he could obtain above average grades.

In response to his behavioral problems the Springers enrolled Edward in September 1994 in the New Dominion School, a private residential school located in Dillwyn, Virginia. The Springers requested that the School Board fund this placement, claiming that Edward exhibited a serious emotional disturbance, a qualifying disability under IDEA. See 34 C.F.R. § 300.7(a)(1). A Fairfax County special education eligibility committee evaluated Edward's condition and determined that his behavior indicated a conduct disorder that did not qualify as a serious emotional disturbance. Thus the committee ruled that Edward was ineligible for special education services and tuition reimbursement.

The Springers requested a local due process hearing, which took place on February 9, 1995. The Local Hearing Officer ("LHO") rendered his decision on March 16, 1995. Relying exclusively on a letter written by a psychiatrist, Dr. Joseph Novello, to the Juvenile Court at the time of Edward's second brush with the law, the LHO found that Edward suffered from a conduct disorder and a dysthymic disorder (a moderate depressive disorder). Edward's "inability to get along with his teachers and fellow students and to abide by school rules" was deemed consistent with these diagnoses. The LHO concluded, without elaboration, that Edward "should be considered `seriously emotionally disturbed' rather than merely `socially maladjusted,'" and that he thereby qualified for special education services. Finding that Edward was making educational progress at the New Dominion School, the LHO ordered the School Board to reimburse the Springers for tuition there.

The School Board appealed to a State Review Officer ("SRO"), who reversed the LHO and found that Edward did not meet the criteria for a seriously emotionally disturbed student under state and federal special education regulations. The SRO primarily questioned the LHO's reliance on the letter from Dr. Novello. First the SRO noted that this letter was originally written at the Springers' request to persuade a juvenile court judge to sentence Edward to three weeks in a camp in Idaho rather than incarceration for the theft of another student's car. The SRO noted that Dr. Novello had never testified in person to elaborate on "[t]he sketchy, incomplete description and evaluation of the Student's makeup" in the letter. The SRO concluded that this sketchiness and incompleteness and "the casual reference to his `clinical diagnosis,' all render [the letter] insufficient in detail and dignity to use as the LHO did, which was to supply the theoretical underpinning of a qualifying factual finding of disability."

Most critically, the SRO pointed out the abundant psychological evidence that Edward did not have a serious emotional disturbance -- evidence that was not even mentioned by the LHO. Several separate evaluations of Edward had uniformly supported the conclusion that, while Edward was "socially maladjusted" and had a "conduct disorder," he exhibited no symptoms of a serious emotional disturbance. In the face of this evidence, the SRO could not accept the LHO's con-

4

clusory assertion that Edward should be considered "seriously emotionally disturbed" rather than merely "socially maladjusted."

The Springers filed suit in district court, seeking reversal of the SRO's decision. At this point, they sought to supplement the administrative record with live testimony from Dr. Novello, although at the state-level review they had represented "that the probable delays and inconvenience in scheduling" his participation (and that of another doctor) "outweigh the need for what they can contribute." The district court granted the School Board's motion in limine, disallowing Dr. Novello's testimony as "additional evidence" under 20 U.S.C. § 1415(e)(2). The district court found that Dr. Novello had in fact been available to testify throughout the administrative proceedings and ruled that the Springers would have to live with their repeated decisions not to call him. Further, given that Dr. Novello had not examined Edward since before Fairfax County's initial eligibility committee meeting, the district court determined that any testimony the doctor could offer would not qualify as "additional" under the statute.

The district court thus agreed with the SRO that Edward was not seriously emotionally disturbed. The court therefore ruled that the School Board was not required to reimburse the Springers for tuition at the New Dominion School. The Springers now appeal.

II.

A student becomes eligible for special education services if he suffers from a "serious emotional disturbance":

> (i) The term means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance--
>
> (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors;

5

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

(C) Inappropriate types of behavior or feelings under normal circumstances;

(D) A general pervasive mood of unhappiness or depression; or

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

(ii) The term includes schizophrenia. The term does not apply to children who are socially maladjusted, unless it is determined that they have a serious emotional disturbance.

34 C.F.R. § 300.7(b)(9); see also Regulations Governing Special Education Programs for Children with Disabilities in Virginia Part 1, "Definitions," at p. 9 (restating federal definition of serious emotional disturbance).

The regulatory definition delineates no fewer than four specific conditions a student must satisfy in order to qualify for special education services as seriously emotionally disturbed: the student must demonstrate that he has (1) exhibited one of the five listed symptoms, (2) "over a long period of time," and (3)"to a marked degree," and (4) that this condition adversely affects his educational performance. Finally, the definition pointedly excludes students whose behavior is attributable to social maladjustment, unless they also suffer an independent serious emotional disturbance.

In interpreting this regulation district courts are required to give deference to the state and local education authorities whose primary duty it is to administer IDEA. As the Supreme Court noted in Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, "[t]he pri-

6

mary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the [IDEA] to state and local educational agencies in cooperation with the parents or guardian of the child." 458 U.S. 176, 207 (1982). Accordingly, we have held that "[a]bsent some statutory infraction, the task of education belongs to the educators who have been charged by society with that critical task. Likewise, federal courts must accord `due weight' to state administrative proceedings."* Hartmann v. Loudon Cty., 118 F.3d 996, 1000 (4th Cir. 1997) (quoting Rowley, 458 U.S. at 206), cert. denied, 66 U.S.L.W. 3283 (U.S. Jan. 12, 1998) (No. 97-586). Above all, federal courts must avoid the temptation "to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206; accord Ash v. Lake Oswego Sch. Dist. No. 7J, 980 F.2d 585, 587-88 (9th Cir. 1992); Kerkam v. McKenzie, 862 F.2d 884, 887 (D.C. Cir. 1988).

III.

The Springers claim that Edward exhibited a serious emotional disturbance that entitled him to special education services, including reimbursement for tuition at the New Dominion School. However, we agree with the SRO and the district court that Edward's juvenile

_____

*We reject the Springers' assertion that Doyle v. Arlington Cty. Sch. Bd., 953 F.2d 100 (4th Cir. 1991), requires a decision in their favor. Doyle and this case are different in at least three respects. First, the LHO in this case has no special claim to deference, as did the LHO in Doyle. There "[t]he only point on which the local and state hearing officers differed in any consequence was in the credibility of one of the witnesses" who had testified before the LHO and did not appear before the SRO. Id. at 104. Here, by contrast, the LHO's decision did not turn on witness credibility but on the weight to be given the Springers' evidence, an inquiry which both the LHO and SRO are required to make independently. Second, the LHO in Doyle explained his result with some care, whereas the opinion of the LHO in this case was both cursory and conclusory. Third, Doyle establishes a prima facie presumption of correctness for administrative findings, which requires that the SRO must provide reasons for departing from the LHO's findings. Unlike the SRO in Doyle, the SRO did exactly that here.

7

delinquency did not reflect a serious emotional disturbance within the meaning of the federal and state regulations implementing IDEA.

A.

It seems incontrovertible that Edward was socially maladjusted. Although neither the federal nor the Virginia regulations define the term, Edward's behavior fits the definition offered by experts and accepted by the LHO and the SRO. The LHO rightly understood the term to refer to "continued misbehavior outside acceptable norms." See also In re Sequoia Union High Sch. Dist., 1987-88 EHLR Dec. 559:133, 135 (N.D. Cal. 1987) ("socially maladjusted [is] a persistent pattern of violating societal norms with lots of truancy, substance . . . abuse, i.e., a perpetual struggle with authority, easily frustrated, impulsive, and manipulative").

The reports of psychologists and other witnesses at the local due process hearing uniformly described Edward's condition in terms of social maladjustment, not serious emotional disturbance. For example, in January 1995, Wendy Rudolph, Ph.D., a school psychologist for Fairfax County, administered a battery of tests to evaluate Edward's psychological condition. She found symptoms of social maladjustment: Edward displayed "a disregard for social demands or expectations. It appears that Ed understands these expectations but that his behavior is not always guided by them." The most consistent diagnosis of Edward's problems was that of a "conduct disorder," which supports a finding of social maladjustment. Conduct disorder is marked by a pattern of violating societal norms and "is often associated with . . . drinking, smoking, use of illegal substances, and reckless and risk-taking acts," all behaviors that Edward exhibited. Barbara G. Lanzer, a teacher and counselor of disturbed youth for over twenty years, testified at the local due process hearing that "[c]onduct disorder is often associated, most frequently associated with socially maladjusted behaviors." And Dr. Rudolph opined that "a conduct disorder is consistent with social maladjustment."

Courts and special education authorities have routinely declined, however, to equate conduct disorders or social maladjustment with serious emotional disturbance. See, e.g., A.E. v. Independent Sch. Dist. No. 25, 936 F.2d 472, 476 (10th Cir. 1991); Doe v. Board of

8

Educ., 753 F. Supp. 65, 71 n.8 (D. Conn. 1990); In re Morgan Hill Unified Sch. Dist., 19 IDELR 557, 564-65 (SEA, Cal. 1992). The fact "[t]hat a child is socially maladjusted is not by itself conclusive evidence that he or she is seriously emotionally disturbed." A.E., 936 F.2d at 476. Indeed, the regulatory framework under IDEA pointedly carves out "socially maladjusted" behavior from the definition of serious emotional disturbance. This exclusion makes perfect sense when one considers the population targeted by the statute. Teenagers, for instance, can be a wild and unruly bunch. Adolescence is, almost by definition, a time of social maladjustment for many people. Thus a "bad conduct" definition of serious emotional disturbance might include almost as many people in special education as it excluded. Any definition that equated simple bad behavior with serious emotional disturbance would exponentially enlarge the burden IDEA places on state and local education authorities. Among other things, such a definition would require the schools to dispense criminal justice rather than special education. As one Hearing Officer explained:

> [I]t is not intended to be the duty of special education to force socially maladjusted children to school by residentially placing them if they choose to remain truant. Programs within other political divisions, such as the Juvenile Justice system, . . . must address this serious problem. . . . If they do not, then Congress should act to place this duty clearly.

In re Corpus Christi, 18 IDELR 1281, 1283 (SEA, Tex. 1992). We agree and find that the conduct at issue falls within the explicit social maladjustment exception to IDEA's coverage.

B.

As the district court recognized, finding that Edward was socially maladjusted does not end the inquiry. The regulations contemplate that a student may be socially maladjusted and suffer an independent serious emotional disturbance that would qualify him for special education services under IDEA. The Springers insist that Edward's is such a case. Like the district court, we disagree.

First we note the overwhelming consensus among the psychologists who examined Edward. No fewer than three psychologists

9

examined him, and each independently concluded that he was not seriously emotionally disturbed. An evaluation done in October 1993 by psychologist Randy Roberts, Ph.D., "[did] not indicate the presence of significant or major psychiatric disturbance." This finding confirmed the assessment of Edward by psychologist Stanley J. Kulewicz, Ph.D., who in July 1993 had identified"no significant behavioral or emotional difficulties." Likewise Dr. Rudolph's January 1995 examination unearthed no evidence of an emotional disability. In her detailed report, which is the most recent psychological analysis of Edward, Dr. Rudolph described him as "a poised and pleasant young man" who is used to being able to "`figure out' how to make the people around him like him and allow him to have his own way." Even when he was misbehaving, Dr. Rudolph concluded, Edward was getting "his own way"; she testified before the LHO "that last year [in the eleventh grade], in particular, Ed was getting what he wanted. He didn't want to do work, so he didn't. He didn't like going to class, so he didn't do that." Dr. Rudolph thus concluded that during this time Edward was in complete control of his actions, which distinguished him from emotionally disturbed individuals, who may be "in such pain and in such difficulty that they cannot get to their goals." Based on her thorough examination, Dr. Rudolph refused to attribute Edward's behavior, troubling though it was, to any emotional disability or disturbance. Indeed, this case is somewhat remarkable in that the relevant psychological evidence is virtually uncontradicted. According to Ms. Lanzer's expert appraisal of this evidence, finding that Edward is not seriously emotionally disturbed is not even "a close question."

The Springers have given us no reason to doubt this professional consensus. They first attempt to show that Edward exhibited one of the five enumerated symptoms of a serious emotional disturbance by asserting that he was unable "to build or maintain satisfactory interpersonal relationships with peers and teachers," 34 C.F.R. § 300.7(b)(9)(i)(B). However, ample evidence supports the SRO's contrary finding. His father indicated that "Ed has lots of friends across a broad spectrum, from very good students to the academically unsuccessful students." Edward perceived himself as "socially . . . very involved with a large group of people that he considered friends." Dr. Rudolph's observation of him confirmed this self-perception, as did his history of involvement with social and extracur-

10

ricular activities during his time in the Fairfax County schools. Nor did Edward fail to develop good relationships with teachers. His French teacher from McLean High, Ghislaine Toulu, told the LHO that she "really liked Ed, and . . . still really like[s] Ed." His history teacher from McLean, Robert Peck, described Edward as "very friendly [with] peers and me." And even Mr. and Mrs. Springer have described Edward as "respectful of teachers and appropriate," and indicated that he "got along well with his teachers." Nothing in the record indicates that an inability to maintain interpersonal relationships existed at all, not to mention persisting "over a long period of time" or "to a marked degree." <u>See</u> 34 C.F.R. § 300.7(b)(9)(i). Thus, neither the SRO nor the district court committed any error in rejecting the contention that Edward was in any way incapable of forming and maintaining relationships with peers or teachers.

The Springers also claim that Edward exhibited a second enumerated symptom, "a general pervasive mood of unhappiness or depression," <u>id.</u> at § 300.7(b)(9)(i)(D). However, we agree with the SRO and the district court that the record simply does not support this contention. Three separate psychological evaluations of Edward revealed no evidence of abnormal depression or other emotional disturbance. Two of the psychologists who reached this result, Dr. Roberts and Dr. Kulewicz, were chosen by the Springers themselves. Dr. Roberts even noted that based on his depression and anxiety testing "Ed is reporting significantly fewer symptoms and distress than is typical of an adolescent his age." The observations of those who had regular contact with Edward during the eleventh grade confirm these psychological findings. For example, Edward's French teacher, who saw Edward on at least 160 days during that year, testified that "[h]e did not appear sad. There was no pervasive sadness. He had friends. He was laughing, joking in the hallways."

The only contrary evidence, indeed the only hint that Edward ever suffered from depression at all, was the "sketchy" and "incomplete" letter from Dr. Novello diagnosing Edward with dysthymia. This condition is clinically defined as less severe than a major depressive disorder. Although Dr. Novello never elaborated on his diagnosis, Ms. Lanzer confirmed that dysthymia is "sort of a low-grade depression." She noted that in over twenty years of work with emotionally disturbed students she has never worked with a student who was classi-

11

fied as seriously emotionally disturbed based solely on a diagnosis of dysthymia. Thus, Dr. Novello's diagnosis would indicate only that Edward suffered from mild or moderate depression, if anything. This evidence simply does not support the Springers' claim that Edward experienced "pervasive . . . depression," 34 C.F.R. § 300.7(b)(9)(i)(D).

There is one final flaw in the Springers' case for tuition reimbursement. Even if they had been able to demonstrate that Edward exhibited one or more of the five qualifying characteristics for a long period of time and to a marked degree, the Springers still have failed to establish the critical causal connection between this condition and the educational difficulties Edward experienced, the final step in proving a serious emotional disturbance. Id. at § 300.7(b)(9)(i). Prior to his eleventh grade year, Edward had made steady educational progress, advancing from grade to grade on schedule. Cf. Rowley, 458 U.S. at 209-10 (evidence that student was advancing from grade to grade indicated educational progress). In the eleventh grade Edward stopped attending classes, regularly used drugs and alcohol, and engaged in other criminal activities. The precipitous drop in Edward's grades at this time appears to be directly attributable to his truancy, drug and alcohol use, and delinquent behavior rather than to any emotional disturbance. See In re Pflugerville Indep. Sch. Dist., 21 IDELR 309, 311 (SEA, Tex. 1994) (noting that when student had made passing grades prior to involvement with drugs, "it is inferentially permissible to attribute any lowering of his grades to his unwise choice to spend less mental energies on his academics and to spend more mental energies on [drug activities]"). Particularly given the paucity of evidence that Edward suffered any sort of emotional disorder, it can hardly be said that the record directs a finding that a serious emotional disturbance adversely affected his educational performance. Edward's delinquent behavior appears to be the primary cause of his troubles.

IV.

The Springers also challenge the district court's grant of the School Board's motion in limine excluding live testimony from Dr. Novello. We hold, however, that the district court's decision not to admit Dr. Novello's testimony as "additional evidence" under 20 U.S.C. § 1415(e)(2) was not an abuse of discretion.

12

In Rowley the Supreme Court cautioned that IDEA left the primary responsibility for teaching children and formulating educational policy with state and local education authorities. The Court reiterated "that courts lack the `specialized knowledge and experience' necessary to resolve `persistent and difficult questions of educational policy.'" 458 U.S. at 208 (quoting San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 42 (1973)).

To give meaning to this rhetoric the Court of Appeals for the First Circuit has outlined a strict approach to the concept of "additional evidence" in section 1415(e)(2). See Town of Burlington v. Department of Educ., 736 F.2d 773, 790 (1st Cir. 1984), aff'd, 471 U.S. 359 (1985). As the court explained:

> We construe "additional" in the ordinary sense of the word . . . to mean supplemental. Thus construed, this clause does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony; this would be entirely inconsistent with the usual meaning of "additional." We are fortified in this interpretation because it structurally assists in giving due weight to the administrative proceeding, as Rowley requires.

Id. (citations and footnote omitted). A lax interpretation of "additional evidence" would "reduce the proceedings before the state agency to a mere dress rehearsal by allowing appellants to transform the Act's judicial review mechanism into an unrestricted trial de novo." Roland M. v. Concord Sch. Comm., 910 F.2d 983, 997 (1st Cir. 1990), cert. denied, 499 U.S. 912 (1991). Therefore the exclusion of "testimony from all who did, or could have, testified before the administrative hearing" would be "an appropriate limit in many cases." Burlington, 736 F.2d at 790. We, along with other circuits, adopt the Burlington approach. See, e.g., Monticello Sch. Dist. No. 25 v. George L., 102 F.3d 895, 901 (7th Cir. 1996); Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1472-73 (9th Cir. 1993), cert. denied , 513 U.S. 825 (1994).

That approach counsels affirmance of the district court. The Springers do not contend that Dr. Novello's testimony was not available during the administrative review process. In fact, Dr. Novello

13

examined Edward months before Fairfax County's initial eligibility committee meeting and had not seen him again after that time. Therefore, Dr. Novello's evaluation of Edward -- and anything he might have added to the letter that is contained in the record -- was available well before the administrative process began. Neither does it appear that Dr. Novello himself was unavailable to testify during any phase of the administrative process. Although the Springers adverted to scheduling difficulties, we see no error in the district court's finding that, despite these difficulties, Dr. Novello"doesn't fall within the category of being unavailable."

Instead, what seems to have happened here is that the Springers made the tactical decision to reserve the expense-- and the impact -- of live testimony by Dr. Novello until trial in federal court. We shall assume that their decision was made in good faith. However, were we to allow these litigants to escape the consequences of a litigation strategy gone awry, we would invite future litigants to engage in strategic behavior that may not be so innocent.

A lenient standard for additional evidence would have the consequence of making the whole IDEA process more time consuming, as parties scrambled to use the federal court proceeding to patch up holes in their administrative case. Whether this lengthy process would serve students is doubtful at best. The IDEA was designed to facilitate the inclusion of disabled children into the public education system. See Rowley, 458 U.S. at 191-97. "Children are not static beings; neither their academic progress nor their disabilities wait for the resolution of legal conflicts." Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 760 (3d Cir. 1995). The district court's decision to exclude the evidence properly encourages thorough administrative review of special education disputes. It facilitates the resolution of these disputes sooner rather than later, and in so doing advances the aims of Congress in this statute.

V.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

14